May it please the Court, my name is Matthew Brinkerhoff, and I represent the appellants and plaintiffs in the three cases that have been consolidated for argument this morning. For almost 70 years, prior to the judgments in these cases, the outside sales exemption under the Fair Labor Standards Act I'm sorry, the outside sales exemption to mandatory overtime under the Fair Labor Standards Act has been strictly construed and applied only to employees who plainly and unmistakably make actual sales or obtain orders. Counsel, is it true that as far as detail men, I think that's the traditional name for the people that drug companies send around to doctors, isn't it? Yes, it's very often used, yes. I thought it was the case that since the 1940s, detail men have been understood not to be covered by the overtime law. If detail men in the pharmaceutical industry, the answer is no. If you're referring to a detail man that actually obtains an order or sells a product I'm not talking conceptually now, I'm talking about the detail men who do whatever they do in the pharmaceutical industry. The people that go around to doctors and suggest to the doctors that this or that drug is a good one to prescribe and they give them some free samples to hand out. If you're saying has the industry always treated these employees as exempt, the answer is yes. That's what I was asking, yes. I'm sorry, I didn't understand. No case has ever challenged whether or not they're exempt under the outside sales exemption and indeed no case has ever held, no appellate case, no other case has ever held, that a person who persuades a doctor to write a prescription Hold on, I'm not getting into the law yet. Okay. I was asking about facts. Yes. So they haven't been paying them overtime since the 40s. I believe that's correct, yes. About a half century. Now the next thing I want to know is, I know this is a California law case, but the California law is similar to the Federal law in some respects and I want to know what authority there is from other circuits that says whether detail men either are exempt as either supervisors or outside salesmen or circuit authority that says they're not. And just to be clear, when you say detail men, you're being specific to the pharmaceutical industry and no other. Yes. There are no circuit cases addressing whether detail men are exempt under any exemptions, certainly not under the outside sales exemption, which is at issue here. So there's no circuit authority one way or the other. Specific to detail men? Correct.  Correct. Now, I have two preliminary questions. I take it you're in agreement that there is no decision of the California Supreme Court on this issue. You are in agreement on that. That's absolutely true, indeed. There is no decision specific to detail men in this exemption by any. I'm talking only about the pharmaceutical industry. I understand. Okay. Now my question to you is, this is obviously an important question and it seems to be one on which there's considerable difference of opinion. Why isn't this an appropriate question for us to certify to the Supreme Court of California? It may well be. As I'm sure the Court is aware, the standard for certification under the California Court rules requires that this Court make a determination that California law in this area is unsettled, that there's no clear appellate authority, whether the California Supreme Court or the Court of Appeal. That certainly is the case here. I do think, although it certainly could be certified, that given the clear indication in all of the case law that the California courts look to the Federal regulations, the Federal cases interpreting those regulations, that one could easily decide if in the first instance this Court concluded that under the Fair Labor Standards Act the plaintiffs in this case are non-exempt, meaning they must be paid overtime, that would end the inquiry. Because what we know is that California law can't be more restrictive than the FLSA, or I guess I should say more generous to employers. What we don't know is whether or not under California law, California law might, but we don't know, might actually afford more protection and might construe the outside sales exemption more strictly than under the Federal law. We know that it's basically a one-way ratchet is the way I would put it. We know that if under Federal law these employees are non-exempt, then they must be non-exempt under California law. Well, Federal law hasn't decided that question, has it? Correct. And nor has California law. Well, not Federal appellate authority. There are numerous, and they haven't been briefed because there have been many cases filed in many jurisdictions. There have been a host of Rule 28J letters that have been filed over the course of the last two weeks bringing to the Court's attention more, you know, additional district court opinions from the Central District of California that are consistent with the decisions on appeal here. There are decisions that adopt plaintiff's reasoning and analysis from the District of Connecticut, Judge Arterton. There are decisions on outside sales that also adopt plaintiff's position under Federal law from Judge Cote in the Southern District of New York in a case called Amendola v. Bristol-Myers Squibb. Could I just ask you a question? We have your 28J letters, so we've seen those cases. About your statement about the FLSA, are you saying, I mean, there's two ways of looking at that statement. One is if the California law was less protective of employees in the FLSA, then the FLSA requirement would prevail in California. Another way of looking at it is to say California interprets California labor law as being as broad as the FLSA, and that would be an interpretation of California case law. Now, which argument are you making, or both? Well, it's both, but certainly the latter, which I think takes care of the former, meaning I think California courts have been very clear that they certainly look to the Fair Labor Standards Act, and indeed here, although not under the outside sales exemption, I'll grant you, the, I'm sorry, the wage commission orders specifically advert to the Federal regulations for a couple of other exemptions, admin, executive. Administrative exemption. They don't specifically advert to the Federal regulations for the outside sales exemption, but, you know, the reality is that the language is very, very similar. Materially, I would say indistinguishable, although there's much more regulatory authority and explanation and guidance under the Federal standard than there is under California law where there's really nothing. I mean, Ramirez on a different issue says, no, don't confound, and I think Murillo and Murillian does the same thing, don't confound our State labor law with the Federal law, although it says, you know, we can be broader, essentially. But they made very clear distinctions between what the State outside sales exemption was and the Federal one was in Ramirez. So why would we have to conclude that the California law is as broad as the Federal? I think it's because of the language. The reason in Ramirez that the California Supreme Court understood the outside sales exemption to be broader, meaning more protective of employee rights than the Federal standard was because it was an issue that relates to this case very much, which is when you're dealing with an employee who has mixed duties, duties that include actual selling and consummating sales, as well as promoting or other activity that's incidental to that core sales activity, you need to make a determination under both Federal and California law as to whether or not the sales activity  Under Federal law, the standard up until 2004 was that although you could look at incidental activity, it didn't have to all be sales activity, it was you basically had to have 80 percent of your activity had to be related to sales. Under California law, the language was completely different. It didn't allow any incidental activity to be calculated. So you needed to be over, in this case under California law, 50 percent, and it had to be all sales. It couldn't be part promotion, part incidental activity, merchandising, things of that nature. Mostly this was applied like it was in Rivera to route driver salesmen. In Rivera it was a salesman who would go from place to place and deliver water bottles and also take orders. And what was clear in Rivera was that the amount of time he spent actually taking orders was far less than 50 percent of his time. And because of the language in the outside sales exemption under California law on this point, there was no way that he would be found exempt, whereas potentially under Federal law he could be exempt because depending on what those other activities were, if they were considered to be incidental to the sales and that the sales was the primary purpose, he could still be exempt. I know that's a long-winded explanation, but the point is that, yes, under Rivera the law is different. It is not different necessarily the language in a material way that's obvious on the point that is presented here. The point that's presented here is what constitutes sales activity in the first instance. In Rivera there was no question there was sales. Here there's also no question there aren't. Counsel, I have a couple of lower-level questions. First of all, you've been saying Rivera and I've been saying Ramirez. Are we talking about the same case? I'm sorry. That's my mistake. Yes. Okay. My next question is, it's no big deal. I just wanted to make sure I had the right case. I was thinking concretely about Ramirez's employer. His boss can tell him when to come to work and take the truck out and when he's supposed to be back. And he mostly delivers water. He also signs up customers for water. With these detail men, as far as I can tell from the record, suppose the boss wants to make him work overtime or suppose the boss wants to avoid paying overtime and constrain their hours. It looks to me as though the boss has absolutely no control. They testified they sell when they want to. Sometimes they're selling late at night. They call it selling even though you could argue that it's not selling. But whatever activity they do to make money, they do it at all hours. And during a lot of daytime hours they're doing stuff that has nothing to do with work, getting their nails done or something. So if you're the boss, you don't know how many hours they work. If you win this case, as far as I can tell, they don't know how many hours they work because I couldn't see anything that says they keep time sheets. Nobody can control how many hours they work. The boss doesn't say you have to work these hours or you can't work those hours because it's totally up to you. And the impracticality of the fit seems to me to cut against your case. If you've got people who kind of like, well, professors are the same way. They work when they want to work. They don't work when they don't want to work. And they write more or less articles. They spend more or less time preparing for their class. The university has no control and no idea. It seems like a really bad fit for a policymaker. One could, at least in theory, have an exemption for all outside promotional persuading employees. Well, as an interpreter, we could say that those factors cut in favor of the administrative exemption. Well, you could, except the regulations make it clear that that would be wrong. Let's say we can't and you're absolutely right. How do you determine the damages? Basically, first of all, increasingly the employers do know how much time is being spent in the field and how much isn't. Most of these plaintiffs are required to fill out reports on computers. They all have laptops. Do they keep timesheets? Everybody has laptops. Do they keep timesheets? No, they don't keep timesheets. And what they undoubtedly keep, because all salesmen do, is they probably keep on their laptop a database of each doctor and everything about the doctor that will bear on their sales efforts. They do. And so that is one place to go for records to determine damages. But that has never been an impediment. Also, suppose the salesman strikes up a close friendship with a doctor and spends some time at dinner or on a weekend or something like that. I don't know whether that time counts. I just, I don't know how to, if you win, if I were a trial judge, I don't know how I'd add up the damages. And in those cases under the Fair Labor Standard Act, that is not an unusual difficulty or problem. It can vary depending on circumstances of the sort that you're describing. But in the end, basically what's done in these cases is there's an attempt made to approximate as best one can the amount of hours that were actually worked. And just to address your question about the policy or the fit, I mean, there are many cases that hold that people who work outside of the office and go from place to place, the Key v. Worthstone case from the Fifth Circuit where it was somebody soliciting magazine subscriptions, the most recent case from the Tenth Circuit that was in a Rule 28J letter called Clement, where people were soliciting young men to join the military, but they were held to be non-exempt because in the end the only one with the authority to sign them up was the military itself, and so there was no actual consummation of a transaction. So it's very similar to this case. If they had hours, did they have hours beyond the office or on the road at such and such time? All of the solicitation or sales or whatever you want to call it, work that was done was outside of the office. And so... I didn't ask you outside or inside. Understand that. I asked you about hours. There's no indication in the opinion what their hours were or whether they were tracked. And in FLSA cases... I know a guy that owns a company that sells vending machine supplies, potato chips and Coca-Cola and that sort of thing, and his employees are not, they have hours. They do. And I'm trying to find out. You're kind of mixing the two together, and I'm trying to separate them out. Okay. And I apologize for not clearly understanding the question, but I will try to answer it directly. There's two issues here, it seems to me. One is, prospectively, could the employers in this case comply with the law? And the answer to that is clearly yes. Like your friend who has route drivers, they can keep their hours, they can keep time, they can check in. It's not a problem to keep track of your time. It can definitely be done. The other question is, what happens retroactively? He also has some control. If he doesn't want to be paying time and a half, he can tell them, I want you back here at 4 p.m. Right. And indeed, pharmaceutical sales reps basically are told that they should be on call, I mean, doing calls from 8 to 5 or 9 to 6 every single day. That's what they're instructed to do. It doesn't mean they can't work past that, because there's no penalty to the employer if they do. If suddenly that were to change, then I would imagine that the employers would be much more strict in ordering them to work from one set hour to an end time. And so it's certainly not a problem prospectively. Now let's get back to my first question. I gather nobody's been keeping timesheets. Not specific timesheets. And, Judge Kleinfeld, that is not an unusual feature of an overtime misclassification case. When an employer misclassifies an employee, for instance, if your friends who have a business with vending machines made the mistake of presuming that their employees were outside salesmen and were exempt, and that person was sued, then what the court will do is make a finding, an approximation based on testimony of the employees, as well as any extrinsic evidence that can be found. And here there is extrinsic evidence of the sort that we've been describing, notations about calls and laptops, doing administrative work, sending e-mails, things of that sort that can help. But it will never be as precise as having timesheets. And that's never been, ever, an impediment to the recovery of damages. It affects the quantum of damages and how confident a fact finder can be about them. But it is not an impediment under any of the cases, because ultimately the burden is on the employer to both follow the law and in the end pay the price if they misclassify an employee and don't keep track of their time. It's not a prejudice that's visited upon the plaintiff for not keeping track of their time. Let me put a question to you that's bothering me. This is a very unusual industry, and it's not the typical industry of sending someone out to sell stuff, because you can't sell this product unless a doctor has prescribed it. And my question to you is, in terms of this unique industry, isn't what these people are doing basically the way sales are being made in this industry? That is, there's nobody who can go out and sell the doctor and say, OK, I will sell you all of these products and you can then give them to your patients. Because that's not the way medicine is practiced, as we all know. You go to the doctor, you get a prescription, and the doctor, in effect, selects what drug you're going to take, and then you take it to your pharmacy. Why isn't this basically the way salesmanship takes place in the pharmaceutical industry? It's not the traditional thing of someone coming around and saying, look at these wonderful pencils we have. We'll give you a good price if you buy 500 of them. That's not the way it works in the department. Why isn't what's done here the way salesmanship takes place in the industry? There are sales that are made in this industry across the board. Sales in this industry are made by pharmaceutical companies to wholesalers and to pharmacies. Just like in the regulations that speak specifically to this under Federal law, when you have a manufacturer's representative who goes directly to the retailer, the purchaser of the product, and persuades them into selling it, they're selling it in that sense. But if, for example, there wouldn't be many purchases of their product if, in fact, doctors weren't prescribing it. There's no question. And the regulations, I think, the two of them in particular that I really want to draw the Court's attention to, speak exactly to this issue and what happens when you have an industry that doesn't fit, and the question of whether or not every industry is somehow entitled to a sales exemption, which they certainly are not. The first is the one I was just adverting to. It's CFR 541-504C2. It is no longer in effect. It was taken out of the amendments in 2004 of the Federal regulations. But given that the California Code adverts to the older regs, and given that the regulations themselves made it clear that they were not working a substantive change in the law, I think they're very instructive, nonetheless, on the distinction between both promotion and sales, and to answering your question. And I'm sorry, it's taking me a minute to get there. So the first is where you have a manufacturer, a retailer, and a wholesaler. And the regulations make it very clear, if you go to the retailer and you persuade them to buy your products and they then order it from the wholesaler, that is not a sale, although what you're doing is driving demand for your product by the retailer. The second example that's given under 541-504C3 is also very instructive, and it is the circumstance where utility companies used to send people out into the field to convince consumers to buy products that used their utility. So, for instance, a gas appliance, a gas stove. And in some circumstances, they would even sell the person a gas stove. And if they did that, they were salesmen. That is a sale and that is exempt activity. But if what they did was take the person down to the appliance store and recommend to them that they buy a gas stove and they purchased it, they were considered to be engaging in non-exempt activity, because the sale was not made by their employer to the end consumer. And those two taken together, I think, make it quite clear that there's two areas of disconnect here in the chain. And the regulations make it very clear. They establish a bright line for employers so they know. They know with certainty, looking at these regulations, whether somebody's exempt or somebody isn't. If it is expanded in the way the district courts have done in the cases on appeal and basically becomes an exemption for anybody who persuades, anybody who influences demand, anybody who increases the bottom line of their company, employers will not know where the line is. They will be free to try to classify almost everyone as exempt, because most employees do engage in activities that help drive just the whole point. If you're in an industry where you're selling services or products, is to try to increase demand. So that alone cannot be enough. And the regulations are very clear about that clear distinction between promotions and sales. Sometimes it works results that seem unusual in the way that I think you're describing, Judge Friedman, where somebody's engaging in activity that looks very similar. But the regulations have made it clear for decades now that what matters, because we want to have a bright line, we want employers to know what they can and they cannot do, is the transaction itself. If there's a firm commitment, if there's an order, if there's an actual, tangible transfer of product. And here there's a disconnect because the plaintiffs are not talking to the end consumer because they can't. They can't try to sell to patients. And there's a disconnect because the person who sells to the end consumer is a retailer. That is not the pharmaceutical company. Why aren't they obtaining orders? They obtain a doctor's order to the patient. Oh, in the case that we just heard, doctor's orders were 20 milligram Lexapro. So the doctor gives the patient a slip of paper. It says 20 millimeter Lexapro. And it's understood as the doctor's orders to take 20 milligram Lexapro. The patient takes it to the pharmacy. Walgreens gives them 20 milligrams of Lexapro. Why isn't the salesman obtaining orders under the California law? What they're obtaining is an authorization to purchase a regulated product. Obviously it's a highly regulated industry for all of the obvious reasons. There are no guarantee that somebody who receives a prescription will actually fill it. I certainly personally have had occasions, I think many of us have, where a doctor has given me a prescription for something if something happens. And it does. Sure. And so ultimately the volitional piece of this is still in the consumer's, meaning the patient's, hands. And the purchase isn't made. The purchase isn't made. The purchase isn't made. The purchase isn't made. The purchase isn't made. And so there's a disconnect in two or three places, which is why this doesn't fit, which is why the district courts in the Southern District, the District of New Jersey, and the District of Connecticut have all concluded that when you look at these regulations, when you look at all of the circuits agreed that these have to be interpreted very strictly, narrowly construed, all of the language, that you cannot change the rules of the game here. There are multiple court of appeals decisions that make this distinction. Be sure to leave enough time for Judge Acuda's question. If I look at the administrative exemption and looking at whether these pharmaceutical sales reps fit into that, there was much less briefing on this. And in Mr. Barnack's case, there were just a footnote per brief. Is this issue before us with respect to Mr. Barnack's case? Well, certainly in Mr. Tong, in all of the cases there has been an attempt made, some more fully than others, to argue for a separate and independent ground for impairments under the administrative exemption. In the end, whether you construe that as being properly made or not, or even whether there's a clear enough record, which I would submit there isn't, what we do know is that the California Supreme Court has now been fully briefed on a case called Harris. Harris, yes. So would we need to hold this for Harris? Harris is about claims adjusters. Is it going to give us the information that would make it sensible or necessary for us to hold any decision on administrative exemption for the California Supreme Court? I think that Harris is going to ultimately control the analysis, I believe, on the admin exemption in these cases, in large part unless the California Supreme Court does something very unusual. But without knowing what that ruling is, and given the sparse record and the lack of any decision by the district judges here on that exemption, it seems apparent to me anyway that the only course would be to send it back to the district judges and have them apply Harris and make determinations about whether or not there's a sufficient record, whether it needs to be supplemented, whether – I mean, it would depend on the nature of the termination by the California Supreme Court. Harris is claims adjusters? Harris is – yes, it's claims adjusters, yes. That sounds as though it's going to be pretty distinguishable anyway. Well – They go to the office in the morning and they come home at night. They have hours. Well, no, this is on the administrative exemption, not outside sales. I understand that, but it's a very different kind of job. But on the material components of the administrative exemption, I think that there actually is not a lot of dissimilarity. I obviously may change my mind depending on how they decide Harris, but – I'm sure that one side or the other is going to distinguish. But in fairness, it – basically, the core issue there is do the people who go out into the – whether you're outside the office or not – Look, the thing about it is control. Suppose you have a secretary in your law office and she's having trouble with her husband. So she stays at the office until all hours instead of going home. And you keep telling her, get out of here. I don't want to be paying overtime for you. I don't want you working late. I don't want you on the streets late at night. Get out of here. At some point, if you're harsh enough, you may be able to control your own office and whether she's physically present in it. But these detail men, you can't. And the adjuster is more like the secretary in your law office. And I appreciate that distinction, Judge Klinefeld, but the cases and the regulations are very, very clear that control is not the issue for whether this exemption applies. But isn't the control one of the major reasons why California and other States have created these exemptions for off-premises sales people? It meant the reason they exempted because of the fact that they say, well, you can't know whether they're working overtime or not because you don't know what they're doing and you have no authority to tell them. You don't say to them, come in at 9 o'clock, leave by 5, or work till 6. Tonight you have to work till 8. But the exemption itself doesn't say that control is what – I know the exemption doesn't say so, but why are these people exempted from the labor hour standards? Why is it that California says that outside sales people are not entitled to overtime? Why? I think that there are a multitude of factors, and I think they are the type of factors that both you and Judge Kleinfeld have pointed to. But in the end, when California passed their outside sales exemption in 1972 and modeled it after the Federal exemption, we have a body of regulations duly promulgated with notice and comment that have the force of law that make it clear that the distinction that I'm making is the one that's critical and that ultimately this exemption is not an exemption that says it's the no outside control exemption. It's the outside sales exemption, and it's been interpreted the way it has, I submit to you as a matter of policy and practicality, because without that bright line, it's very difficult to determine what's enough control, what isn't enough control, who it should apply to, who it shouldn't. Obviously, other issues are there, too. Commissions, all of the indicative sales that we fight about whether or not it applies in this case. All of those things are a part of it. But ultimately, the Congress made the judgment to give this authority to the Department of Labor. The Department of Labor has exercised it in a lawfully appropriate way, and it's made a very clear, bright line. And this case, frankly, is not even close. It feels like the same kind of activity, but the cases and the regulations make it clear that it is non-exempt activity. Thank you. Good morning. I assume the clerk remembers the times for these different lawyers. I don't. I'm looking to see if he does. One more minute. I thought I had 17. He does. Good morning, Your Honors. Michael Banks. I represent Wyeth. By agreement of the parties here, I've been asked to take the lead on addressing some of the common issues. as well as any issues that may be specific to the Wyeth case. If I may, I would like to begin by addressing the questions from the panel to Mr. Brinkerhoff. I've lumped them in my notes into six rough categories, and I'd like to try to tackle those first, if that's okay. The first question, Judge Kleinfeld, that you asked related to some of the law that's come down involving pharmaceutical sales representatives and the history of the application of that exemption. It is correct that there is no appellate court decision, circuit court decision, answering the question. However, we now have ten cases in which courts have been asked to rule on summary judgment motions involving all district courts. We're not bound by them. Not bound, but they may be persuasive in their rationale. We can't just say, well, nothing we can do. We're bound by it. Certainly not bound by them, Your Honor, but it is noteworthy that of those ten cases, in nine of the ten, pharmaceutical sales representatives were found to be exempt. The only one that did not reach such a conclusion found that there were factual questions on the administrative exemption. That's the Connecticut case, the Berenger case, and that further proceedings were needed. The slate is even more clean when it comes to California law. That tally I just gave you is a mix of Federal and California law cases. There are eight cases that have been decided under California law involving pharmaceutical sales representatives by seven different Federal district judges. Every one of those cases, eight zip, has found that the pharmaceutical sales representatives are exempt under the outside sales exemption in California. Here's my question about that, reading through the district court cases, that the essence of their decision, and I think I saw that in the briefs as well, is the it walks like a duck, it quacks like a duck, it must be a duck, you know, which has a lot of intuitive appeal. But when you get down to what the State Supreme Court and the State courts have said about how you do statutory interpretation in this labor context, they said we look at it very narrowly. It's remedial statute in favor of the employee. We infer that the IWC wouldn't have wanted to be less employee-friendly than what the Feds have. And so the thrust of the statutory interpretation guidance that we're getting from the State court seems to be against your much broader reading of what constitutes an outside salesperson. I'm sorry. I didn't mean to interrupt. No, please. Judge Acuto, we don't intend, nor do we ask this Court to construe the statute broadly. We're construing it based on the words, which are not fully defined. The California wage order refers to outside sales as selling intangible or intangible items or, in the disjunctive, obtaining orders or contracts for products. And I believe that was one of the questions that I'm trying to remember which of you  I beg your pardon? It doesn't matter. It doesn't matter. Okay. About the reality, I think it may have been you, Judge Friedman, who raised the question about the reality of obtaining orders. The customer here for the pharmaceutical companies is the doctor. That's the only realistic customer because that's the one who controls how much the product is sold. The wholesalers and the pharmacies order products based on the number of prescriptions that they have to fill, but they don't order it out of some person calling saying you should buy a lot of this particular product. It's a great product. They're ordering based on the demand generated by the prescriptions. I think, Judge Ikuda, what these courts have recognized is that pharmaceutical companies employ these large sales forces because this is their only ability to sell. It's what Judge Wilson noted in the Wyeth case. If sales to doctors, if these efforts are not construed as sales and doctors are not seen as the customers, then there really are no sales people for the whole industry. Well, I don't have a problem with that. I mean, maybe that's the case. And I see all sorts of these advertisements on television trying to persuade me to tell my doctor that he should prescribe sleeping pills for me. So that advertising or what I think in the olden terms was missionary work, I mean, the feds really do make a strong distinction between promotional missionary advertising type work. Why don't we just say in this industry you don't have the opportunity to consummate your own sales, which is the definition of sales people for the feds or at least how it's been briefed to us. Well, actually not, Judge Ikuda. The word consummate is not in the statute or the regulations or the wage orders. There's nothing in there that requires a specific delivery of a product. What it says is selling or obtaining orders. Under California law, the way prescription is defined, it is an order. It is an order for a product. It may not be filled by the patient ultimately. The patient may choose not to fill it or may fill it with some generic from the pharmacy, but the sales activity generates the order in the form of the doctor writing the prescription. So you've got the order side in the disjunctive language of the wage order and then, again, selling what is sales. In the Novartis case, the district court was construing both California law and federal law. And I thought they had a very interesting analysis. Looking at Novartis alone, he said they spend about half a billion dollars a year on 6,000 pharmaceutical sales representatives. If we look industry-wide, it's hundreds of thousands of representatives and many billions of dollars a year. And the reason they do that is the pharmaceutical companies have understood from the 60 or so years of experience, Judge Kleinfeld, that you have referred to that this is how you sell your product and it's the only way to sell the product. Again, as Judge Wilson and others below noted in the cases before you, this is the only opportunity to sell. I believe, Judge Friedman, you noted something about the uniqueness of this industry. And that is important in understanding, I think, the dichotomy here between the sales activity by the representatives and the ultimate distribution of the product. The wage laws, California wage and hour laws, regulate the activity of the individual. There is an entirely separate set of laws, of course, as you noted, sir, that regulates the distribution of pharmaceutical products. It's very, very unique to this industry. Doctors, excuse me, pharmaceutical companies don't send salespeople out to call on patients. They can't. So you've got the separate set that regulates the distribution, but it's the one that regulates the function of what the person does. And if we look at what the function of the person does, whether it's in the Wyeth case, the Baer case, the Roche case, or any of these cases, the function is to sell. In each of these opinions, the courts did, I thought, a very fine job of going through the undisputed facts, noting these people applied for sales jobs. They were hired as salespeople. Detail men is a phrase, Judge Kleinfeld, that when I started to practice was still in vogue somewhat, but I think in the last 25 years they've been referred to as pharmaceutical sales representatives. I know that's not dispositive, but that is what they're hired for. Long before these cases were filed. It's not a defense tactic. They were trained to sell. They were evaluated on sales. They're compensated in part. You don't call them detail men anymore? No. Maybe somewhere. But that term goes back to when I started to practice and before. If I could get to just a couple of the other questions. I know, sir, you asked. Yes. Could you talk a little bit about the administrative exemption? I can, if you'd like. Explain it in summary form and explain why it applies. Okay. I'm happy to do that. Well, I don't. Just work through the health of it. The administrative exemption only applies if the outside sales exemption doesn't. I don't think the sales representatives would be exempt under both. I think here it's an either or. And the reason is. Well, couldn't it be. It seems to me that if you were to win on either ground, we'd never reach the other. Isn't that right? That's right. But the reason we argued outside sales as our primary argument is that's what we believe and what the industry believes these people do is selling. But. Is there some importance. I noticed that. And I was actually a little surprised. And that's why I was curious about it. Is there some practical reason why your side wants to win on the sales exemption rather than the administrative exemption? We thought being accurate with the court was of sufficient importance. And I'm not trying to be flippant. That's very nice. But. No, no. Really, Judge. I just don't know why the litigant is, when he has the ball, is running that particular direction. Having counseled and represented pharmaceutical companies for many years, I'm conscious of the industry treating these people like salespeople. I've litigated many sales representative cases, although not always in the wage and hour area. That's how the industry thinks of them as salespeople. Now, if the court holds they're not salespeople, if it says that notwithstanding the fact that the doctor may be the customer, product doesn't change. Are you saying we can't, is the law that we cannot reach the administrative exemption unless you lose on the salespeople exemption? I don't think Judge Klein felt it's that clear. But under the federal side, which I recognize isn't perfectly controlled. Usually what you do when you're on the bench is you choose the clearest, easiest ground. Right. And you go on that and you don't make decisions on the others. But sometimes you're not allowed to reach that. Right. Without first making a decision on the others. And that's what the eight cases. My cats used to be in the criminal area until Pearson overruled it. That's what the eight cases below have done from the district courts is, I think, find the most applicable exemption. But if. But in each of these three appeals, there's an appeal from a judgment of the district court applying. That's right. Outside sales exemption. That's correct. So I assume that would be what would be challenged normally. That's why I came prepared to argue the outside sales exemption. But to Judge Kleinfeld's question, if they are not selling, then that is because the court or some court would have concluded that they are promoting rather than selling. And under the at least federal regulations, which I should say are embraced in the California wage order. The California wage order is very interesting. It says we adopt. Before you get to the California wage order, just back on the administrative exemption. Yes. Do you agree that we should hold any decision if we made a decision on that ground for the California Supreme Court's decision in Harris? No, Judge Okuda. That was one of the six areas of questioning that I wanted to address. The Harris decision addressing claims adjusters will perhaps answer the question as to whether claims adjusters are involved in the production side of the business. Because that's what insurance companies do. They process claims and things like that. That's their production employee. Or whether that meets the administrative exemption as being integral to management or the operations of the business outside of production. Here, if these sales representatives are not selling, then they're promoting. And promoting, under the regulations, is described as something that is within the administrative exemption. Promotional activity is not production. The production workers at the pharmaceutical companies make the products. Put the products together, put them in little gel capsules, things like that. Those are the production employees. So I don't think the Harris question should be expected to answer anything in this case about the administrative exemption or otherwise. What do you say, if anything, just give me a short answer. Do you think we should certify this question to the California Supreme Court? I do not believe that's necessary. Of course, the Court's in a better position to determine that than I. But one of the standards Mr. Brinkerhoff correctly mentioned is whether there's been disagreement from the courts such that guidance is needed from the California Supreme Court. With the current 8-0 landscape interpreting California law, including seven cases from Federal courts in California, I don't think there's been any indication of disagreement such that certification to the California Supreme Court is necessary or appropriate. Judge Kleinfeld, you asked a number of questions about tracking of hours and the importance of that. And I submit to the Court that the issue of tracking of hours isn't so much a damages question, but it goes to the purposes of the exemption itself. And some of the courts below, I believe at least two of the three opinions below that are before you, the Wyeth and Bair case is cited, the Jewell T. case from the Tenth Circuit. That is a circuit court opinion. Jewell T. on outside sales in a different industry, not pharmaceutical sales. But the Court had a very interesting observation in Jewell T. What it did was note that you've got the purpose of the statute, but also the reason for it. And the reason it said is a sales representative works individually. He has an ability to earn more pay by more effort. He's not subject to personal day-to-day or minute-by-minute supervision. You can't tell him to go home. And the employer cannot effectively track his hours. That's why they're exempt, because they can do better managing their own time and being evaluated and compensated. Of course, those are the facts in each of these cases. And to quote the Tenth Circuit in Jewell T., to apply hourly standards is incompatible with the individual character of the work of an outside salesman. So the issue is not really one of just, well, how would we award damages or how would we calculate damages? But as the Ninth Circuit has noted in the Bothell case, as the U.S. Supreme Court has noted in the Arnold case, it's finding the letter and spirit of the exemption. Because while exemptions are construed narrowly, they also must be interpreted reasonably and consistent with the spirit. And the spirit here, as I believe Judge Kleinfeld may have – I don't want to suggest you inferred. That's presumptuous. The questions you raised, Judge Kleinfeld, go to the reasoning behind these exemptions. And if you look at that reason and ask what are these people doing on a day-to-day basis, which is completely undisputed, there should be no question that this falls within the reasoning and purpose behind the exemption. Do you agree or do you disagree that the Federal regulations of 2001, when the IWC order came out, would have placed the pharmaceutical sales representatives in the promotional category as opposed to the outside sales? No. Can you talk about that for a moment? I'm sorry, Your Honor. Could you address that? Could I address that? Yes. I don't believe they put them in that category of promotional in the 2001 regulations. Again, the Federal standard is a little bit different. The IWC wage order that's at issue in this case is 4-2001. That's the California wage order that controls. And I believe, as Mr. Brinkerhoff noted, that regulation says explicitly, we adopt – I don't know if they say as controlling – but we adopt the Federal regulations as definitive or defining some of our terms for the administrative exemption, not for outside sales. So for whatever reason, the IWC did not embrace the California standards. And they could have written the wage order to use the exact same definition of outside sales, but they didn't. But just looking at the Federal standard, Your Honor? I do not believe that the Federal standard there controls. There is language in the Federal standard that cites certain examples. It cites certain examples of sales activity, saying these are some of the things that constitute sales. But the Federal regulation – or excuse me, the statute, actually, which refers to outside sales as it begins selling, and then the interpretation, the regulation doesn't say explicitly selling is limited to something. And then it concludes with the phrase other disposition. And that's an undefined term. They don't tell us what selling means specifically or other disposition beyond giving a few examples. There's nothing in the regulations themselves from 2001 that says that a pharmaceutical sales representative is promoting or that this calling on customers, i.e., doctors, persuading them to buy is something other than selling. You know, I had a case a few years ago, different industry, where a salesperson was selling very, very expensive computerized systems to large companies, multimillion-dollar systems. Some of these salespeople might go a year or two without getting an order or making a sale. It's their sales activity. It's their labor. It's what they're trying to do here, trying to induce and persuade, which fall within the definition of sales, that I submit have led eight – well, seven judges in eight courts unanimously to find California law to treat these people as outside sales exempt. Your Honor, I do have my agreement with my co-counsel that I don't want to violate. But if there are more questions for me, I'm happy to address them. Let's move on to co-counsel, unless my colleagues have questions. Thank you, Your Honors. Good morning, Your Honors. Julie Cotton from Orrick, Arrington, and Seckwith on behalf of Roche Laboratories. And I just intend to make a few points and not be completely repetitive of Mr. Banks' argument. But one question that you asked Judge Kleinfeld earlier is that – had to do with can California law be more favorable, less favorable, or Federal law be more favorable? I didn't ask that, but it doesn't matter which of us asked what. I'm sorry. I believe that somebody asked that question. And the answer to that question is, although it's unusual, California law can actually be more favorable to employees. And the way that you determine whether it is or is not is you look at the actual statute of regulation that we have in place. This is – all three of these cases involve only California law. Although – I would think that it would be plain. California law can be more favorable, less favorable, or the same favorable. And if it's less favorable and you're on the employee's side, you're just sued under Federal law. That is correct. In these three cases, they have not sued under Federal law. They sued under California law. That is right. And so although we are spending a lot of time looking to the FLSA for guidance, it is simply that. So to the extent that you were – I think we're also looking at it because you have some difficulty with your case under the promotional language in the Federal regulation. Well, I disagree with you, Your Honor. I think the promotional language – if you're referring to the promotional language in the outside sales – 541.504. I think that that is – actually supports all of our cases, Your Honor, because the utility person, for example, they give the example in that regulation about the utility person who actually makes the sale. And they say that person does indeed fall under the outside sales exemption, just like these people do. For all the same reasons that I won't reiterate that Mr. Banks already said, these people are making a sale. The doctor is the controlling factor in whether or not a prescription is written. And so, therefore, I think that those regulations actually support our case rather than diminish our case. So with regard to Judge Friedman, you asked a question about isn't this just sales. I mean, in fact, we contend that it is. And if you look at the underlying records of all three cases, you see that all three of the plaintiffs in these cases all agree that it is just sales. They all refer to their jobs as sales. I'm looking for a cite from my particular plaintiff. Roxanna Menes said, when I was asking her what her job title was in her deposition, her official job title was medical representative. And that was the answer that I was trying to get. But what she indicated to me is, well, you know, I can't remember the job title for sure. But, you know, when I think of what I do, it's just sales. You know, we know that the word sales is susceptible of a number of different interpretations. And we've read your briefs on both sides. But certainly it's susceptible of a narrower interpretation, which is the one that was laid out by plaintiffs in their briefs, which is there has to be some actual transaction where the salesperson walks away with an order or has actually gotten some money and given some goods. So a very narrow definition. So the question to my mind is, well, given the direction of the California Supreme Court that we interpret the statute favorably to employees, why doesn't the plain language require us to look at the narrower interpretation of sales? Well, because I think, Your Honor, it's a good question. But if you look at the plain language of the California outside sales exemption, all it says is that you have to be selling tangible or intangible items or obtaining orders. Right. I know you have a broader definition of what selling entails. But, you know, the ad man who puts the advertisement on television, he's selling as well. He's certainly selling the product. But he's not going to be covered by this regulation. Or ad woman. Yeah. The ad woman, exactly. I think the marketing or advertising, they are not their consummating sale. Just because I happen to watch a TV commercial that where Sally Field is telling me my client's product is Boniva. If Sally Field is telling me that I should take Boniva because it's a once per month formula and I don't have to worry about, you know, not taking it very often, in that instance, there is no sale being made. Sally Field is not walking off with an order from me. That's correct. But neither is the pharmaceutical sales rep walking off with an order from the doctor. So, I mean, it seems like she's closer to Sally Field than she is to the person who's actually exchanging money for goods. But when Julie taught the patient here Sally Field, she still has to go to the doctor to get the order for Boniva. She can't go to, I can't go to my local Walgreens to fill that prescription because Sally Field told me that that's the best medication for me. What I need is I need to go to my physician and the physician decides whether it's Boniva that's the best product for me or maybe it's one of our competitor's products that's the best product for me. Well, you're describing it as a bottleneck. So is the insurance company when they say, no, no, no, we won't approve that, it's off-label or there's a generic or something like that.  They prescribe a lot of things off-label. It's got the FDA approval for one thing. They prescribe it for seven others. And, in fact, most of the prescriptions are off-label because it's not worth it to the drug company to keep getting approvals from the FDA. Well, so what Roxanna meant is her job at Roche was to convince the doctor. The doctor can't order it, really, until it goes through the bottleneck of the insurance company. And what you just said is that the doctor is the salesman, unlike the person on television, because the doctor is a bottleneck. You can't get it without the doctor's approval. The doctor, Your Honor, is the decision maker. The doctor might decide that another product is the best for me when I go see the doctor, or the doctor might write me that prescription for Boniva after I saw the commercial with Sally Gill telling me about the benefits of that product. It's up to the doctor to decide what product I get, and that is exactly why these people are making a sale. They are the decision maker in this process. Just like in the old-fashioned days when somebody came and knocked on your door with their wares, you know, in tow, you were the decision maker. In this instance, it's the doctor. What do you think is the actual sale? Is that when the doctor writes the prescription for the patient, or when the patient takes the prescription to the pharmacy and says, here's the prescription, and the pharmacist fills the prescription and says, okay, that's $16.40. Which one is the sale, or are they both sort of part of the sale? I think that they're both part of the sale. I think that the decision that a product will be prescribed is certainly made at the time that the doctor writes that prescription, and that usually would occur. Is that a sale? Money has not yet changed hands, but if the patient takes the prescription to the pharmacy, which there is more to the chain, there's no doubt about it, but the key fact about the fact that there's more to the chain is that there's no intervening factors. There's nobody else that comes in to make the sale, and that's what some of the promotions versus sales regulations and cases talk about. All of the cases where, you know, individuals, the Clements, the Army recruiters, somebody else was making the sale. In this instance, there's nobody else that makes the sale other than the Roxanna Mendez's of the world. She convinces the doctor that that doctor should prescribe her product, the product that she represents. All right. Nothing else. Thank you. Good morning, Thomas Peterson, Your Honors. I think my colleagues have pretty well shared with you the points we'd like to make. I just wanted to make a couple of very brief points responding to a couple of minor questions the Court had. Well, questions the Court had. First. Which company are you? Bayer, Your Honor. I'm sorry. And obviously, if you have any questions about the Bayer case specifically. With respect to the Harris case, you've heard a lot about what that case is about and how it may be different. I just wanted to mention one other facet of it, which is worth keeping in mind, and that is that that case is technically on review of an order decertifying a class action. Now, it has embedded in it some legal questions, and I don't mean to suggest the California Supreme Court isn't going to speak to those, but like the Federal law, California law ordinarily isn't necessarily going to give us an elaborate legal decision because of the principle that in a class action case, the courts aren't necessarily. You're saying we have no idea what we'll get out of Harris? Well, no. I'm suggesting you will get some. I think you have, as the Court recognized before, you have a case that undoubtedly went there. It's in a different industry. It went there, I think, because there were diametrically opposite Federal and State court decisions. And it's also, as my colleagues earlier pointed out, different because here, if you reject the idea that there is a selling activity going on, then certainly even the plaintiff's contended is promotional activity, which brings us under Harris. I have two questions here. Yes. That are still bothering me. One is, although the case focused on sales below, it's summary judgment. We can affirm on any grounds supported by the record. If we feel like we need further briefing, we can ask for it, but everybody's briefed it. I'm wondering why we shouldn't decide one way or the other on the supervisor or on the, I think I just forgot the word. Administrative. The administrative exemption. And my second question, well, go ahead and start with that one. Well, Your Honor, I think you have the power to select alternatives for purposes of considering. If you can affirm in the case, you don't have to decide both. Do you have anything more to say about the administrative exemption? And is there any way we should not decide on the administrative exemption? I think that you have before you a record which, like some of the other cases in other jurisdictions where it's been resolved on summary judgment, I think you have the necessary facts to draw the conclusion that the administrative exemption would apply given we're dealing with promotional activities. Was it raised below in the summary judgment motions? It was raised in the Bayer summary judgment motions, Your Honor. It was fully briefed as an alternative ground, and I believe that's, I'm. Was that joined in by the other companies? Well, they're entirely different cases before different judges, Your Honor. Up here. Briefed in all three, Your Honor. So it was fully, it was a fully litigated question in the case. And my other question is, since, although California law turns to some extent or considerable extent on Federal law, the claim is made under California law, is there any good reason we shouldn't just ship the file over to the California Supreme Court, let them decide what California wants to do? Well, you, you know, you have to make that final decision. Here's the reason why I don't think that's an appropriate course of action in this case, and I think the reason is that what you've got, as my colleague, Mr. Banks, pointed out earlier, is you have a fairly uniform view that's been taken in district courts. Now, you know, the typical kind of case, the California rules on a certified question still require that it be the kind of question the California Supreme Court would accept as part of its normal docket. Normally, the kind of question the Court's going to take is one where there seems to be a substantial amount of disagreement about what the state of the law is. And I don't think you have that kind of a situation. It's thus quite different than what you had in Harris. Well, here, they may turn us down. That's one reason not to certify. Right. Are there any other reasons not to certify? Well, I, I think the fact, other than the fact I think you've got eight very persuasive opinions on the outside sales exemption. Frankly, the usual reason we don't certify when we decide not to is it'll take a godawful amount of time and, and increase the litigation expenses considerably, and we don't feel it's necessary. It doesn't look to me as though either of those factors affects this case. Well, I, there, I think this issue is one of importance throughout the country because it's being litigated in a lot of different places. And, and while this, this case involves a question of California law, I think that a lot of courts elsewhere would be interested in getting the insight of a circuit court on the question. It's something we don't yet have. And so the, the fact that we would have to put off for a considerable period of time of decision, I think, would, would tend to impair the development of the law to some degree. And, and, and in addition, I think, you know, another issue bearing on certification is that because certainly the. We would kind of like it if in the event that we're wrong, we get overturned. However, I cannot quite imagine the Supreme Court granting cert on something that is ultimately only a matter of California law. I, I, I think that's true, Your Honor. They, they certainly wouldn't take a question like that. But what I was about to say is keep also in mind that with respect to particularly the administrative exemption, because California explicitly tends to borrow from the, the Fair Labor Standards Act, you, you have embedded questions of Federal law there as well. Just one quick follow-up. Is this case, this issue going to come before the California Supreme Court in any way other than our certifying it? Or is it going to be diversity jurisdiction in, in every case? Your Honor, I, I, I, you know, I, I don't, I can't speak for the entire industry, so I'm not sure whether they're going to, you could imagine a situation where there, there would be a defendant where you would have a, you know, a non-diverse case. I, I, I just don't know the answer. I, I, obviously you, you've got many examples of cases where they have been in Federal court for that reason. But I, but I, I can't give you a definitive answer. Has there been a case that's, that hasn't been removed that you're aware of? No. Okay. Thank you, counsel. Thank you. We're ready to submit. It looks like you're real eager. Why don't you take one minute if you want to speak to this, even though you used up your time. I would say, I just want to address the certification and administrative exemption issues. Go ahead. Because there's been a lot of discussion about them. Certification under the California Supreme Court rules does not require there to be conflict so much as a determination by this Court that the issue will be dispositive and that there is no appellate or Supreme Court authority. And certainly on the second question, there's no question that there is no such authority on outside sales. And on the first question, it would certainly be dispositive. So there's no question the Court could make the certification under the California court rules. On the administrative exemption, I would just commend the Court or ask the Court to, although the opinion is officially withdrawn on Harris, it is available on West  Law. It's available under, excuse me. Sure. We know that. Well, whatever. It's available on West Law. If you look at the opinion, it goes through the detail. Basically, the requirement under admin is that you have to have activities that are, it's not just that if it's promotional, you're administratively exempt. There is this notion of whether or not you're a court of management, whether or not you're setting policy for the company when it comes to promotion, or whether or not you are a person who's out there doing the business of the company. And the Harris opinion goes through in detail all of those factors. You're talking about the withdrawn opinion now. Correct. Thank you, counsel. Thank you. Thank you. Destee versus Beyer, Barrapee, Wyeth, Menesquee, Roach are submitted and you're adjourned for the day. Thank you, Your Honor. Thank you. Aye.
judges: Kleinfeld, Ikuta, Friedman